UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

TIVIA LEITH on her behalf and on behalf of her
infant son "K. D.", and all others similarly situated,

          Plaintiffs,

   -against-

THE COUNTY OF NASSAU, THE NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER K. SOVARAS
Badge #9377, in his official and individual capacity,
POLICE OFFICER KATHLEEN REID Badge #6584,
in her official and individual capacity, NEW YORK STATE
TROOPER AZIZ Badge #171, in his individual capacity,

          Defendants.

------------------------------------------------------------------------X

**DOCKET NO.: CV-22-6933**
**(GRB)(AYS)**

**SECOND**
**AMENDED**
**COMPLAINT**

***JURY TRIAL DEMANDED***

   PLAINTIFFS TIVIA LEITH (hereinafter "Ms. Leith" or "Plaintiff") on her own behalf, her infant son "K. D.", and on behalf of a class of similarly situated individuals, by and through their attorneys, the LAW OFFICES OF FREDERICK K. BREWINGTON, as and for their Second Amended Complaint by grant of Court, states and alleges the following against the above named Defendants.

## PRELIMINARY STATEMENT

   1.  Prior hereto, Plaintiffs filed their Complaint on November 14, 2022, and their Amended Complaint on November 26, 2022. This is a second amendment of that Complaint which is done pursuant to the Order of this Court, entered April 3, 2023, by the Honorable Gary R. Brown.

   2.  This is a civil action seeking monetary relief from THE COUNTY OF NASSAU, THE NASSAU COUNTY POLICE DEPARTMENT, POLICE OFFICER K. SOVARAS Badge #9377, in his official and individual capacity, POLICE OFFICER KATHLEEN REID Badge #6584, in her official and individual capacity, NEW YORK STATE TROOPER AZIZ Badge #171, in his individual capacity, for committing acts under color of law and depriving Plaintiff of her rights

secured by the Constitution and laws of the United States and the State of New York. Plaintiff alleges that Defendants without probable cause used unnecessary force, inflicted physical and emotional harm, and negligently, intentionally, and without cause, falsely arrested, malicious prosecution, falsely imprisoned, and stripped searched Plaintiff, causing emotional/physical harm and pain and suffering, all in violation of her constitutional and civil rights.

## JURISDICTION AND VENUE

3.     This action is brought pursuant to 42 U.S.C. §§1983, and the First, Fifth, and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the aforementioned statutory and constitutional provisions. This Court is requested to exercise pendent jurisdiction over Plaintiffs' NYSHRL claims pursuant to 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue in the Eastern District of New York is proper under 28 U.S.C. §1391, based on the fact that Class Representative Plaintiff resides in Nassau County, New York, the events complained of occurred in Nassau County , New York  and the Defendants are conducting business in the State of New York, specifically Nassau County.

## PARTIES

5.     PLAINTIFF TIVIA LEITH (hereinafter "Ms. Leith" or "Plaintiff") is a Black/African-American woman, and at all relevant times to this Complaint resided in Nassau County, New York.

6.     PLAINTIFF "K. D." is an infant Black/African-American male and at all relevant times to this Complaint resided in Nassau County, New York.

7.     Defendant COUNTY OF NASSAU (hereinafter "COUNTY") was and is a duly

constituted municipal corporation of the State of New York existing and operating under and by the virtue of the laws of the State of New York.

8.     Defendant NASSAU COUNTY POLICE DEPARTMENT (hereinafter "POLICE DEPARTMENT"or "NCPD") is an agency of NASSAU COUNTY.

9.     Upon information and belief, POLICE OFFICER K. SOVARAS (Badge #9377) (hereinafter "Defendant K. SOVARAS" or "SOVARAS"), sued in his official and individual capacity, was at all relevant times employed by the COUNTY as a Police Officer in the Nassau County Police Department.  At all times relevant hereto, Defendant SOVARAS acted, or purported to act, under color of law.

10.     Upon information and belief, POLICE OFFICER KATHLEEN REID (Badge #6584) (hereinafter "Defendant REID" or "REID"), sued in her official and individual capacity, was at all relevant times employed by the COUNTY as a Police Officer in the Nassau County Police Department.  At all times relevant hereto, Defendant REID acted, or purported to act, under color of law.

11.     Upon information and belief, NEW YORK STATE TROOPER AZIZ (Badge #171) (hereinafter "Defendant AZIZ" or "AZIZ"), sued in his individual capacity, was at all relevant times employed by New York State as a State Trooper in the Nassau County.  At all times relevant hereto, Defendant AZIZ acted, or purported to act, under color of law.

12.     Upon information and belief each of the individual Defendants named herein and all of whom are known by name by Defendants, but are not known to Plaintiff, are Caucasian.

## **FACTUAL ALLEGATIONS**

### _THE EVENTS OF DECEMBER 7TH AND 8TH , 2021_

13.     On December 7, 2021, at or about 5 p.m. Ms. Leith was lawfully driving home with

3

her nine (9) year old son, K.D., after picking him up from school and going to the grocery store.

14.     Ms. Leith was driving lawfully with her seatbelt on and was not speeding. The traffic was moving slowly as it was rush hour on a weekday.

15.     While Ms. Leith was driving in traffic, she looked to her right and saw a police car. At that time, her eyes met the eyes with a Nassau County Police Officer now believed to be Defendant K. Sovaras.

16.     After the Plaintiff's eyes met those of the officer, the officer then pulled behind Plaintiff's car and was observed by Plaintiff through her rear -view mirror.

17.     After pacing Plaintiff in traffic and following her for about two to three minutes, the officer activated his lights and Plaintiff, not knowing why she was being stopped, promptly pulled over to the side of Sunrise Highway.

18.     Subsequently, the officer, who had pulled in behind Plaintiff's car, emerged from his car and approached Plaintiff's driver's window.

19.     Ms. Leith was confused, shocked and surprised as she was lawfully driving on Sunrise Highway at or near Newbridge Road in Bellmore when she was stopped by the officer.

20.     Upon being pulled over, Ms. Leith asked the Nassau County Police Officer, who is now known to be Defendant K. Sovaras, Badge #9377, for the reason she was being pulled over.

21.     Upon Plaintiff's request Defendant Sovaras did not provide Ms. Leith with a reason for the stop and instead told her to hold on.

22.     After taking Ms. Leith's license and registration, Defendant Sovaras went back to his police vehicle.  After the passage of some minutes, Defendant Sovaras returned to Plaintiff's car. Upon his return to Ms. Leith's car Defendant Sovaras said that Plaintiff had an outstanding New York State warrant.

23. Ms. Leith questioned how was it that she had an outstanding state warrant for her arrest when she had just begun a security job, in which a full background check was conducted on her prior to receiving the job. Defendants disregarded these crucial facts.

24. Defendant Sovaras then commanded Ms. Leith and her infant son, K. D., to exit her vehicle. Ms. Leith, although very concerned for her safety and the safety of her son, obeyed the instructions, exited her vehicle, and complied with all of the NCPD Officers' commands.

25. At one point during the interaction, three (3) more Nassau County Police Department (hereinafter "NCPD") cars pulled up to the scene.

26. Upon information and belief, Defendant Sovaras was training or mistraining the other NCPD officers who were present.

27. Ms. Leith, in utter disbelief as to what was happening, humiliated, embarrassed, and scared, began to cry in fear. While the police had no reason to search Plaintiff's car, they did so anyway. Nothing illegal was found.

28. Defendant Sovaras and/or his partner told Ms. Leith to place her son in police custody because she was going to be arrested for the alleged state warrant. That statement placed Plaintiff in greater fear and distress. Ms. Leith knew she had done nothing wrong and refused to place her young African American son in police custody.

29. K. D. was also in shock and crying due to the traumatic experience caused by Defendants.

30. Seeing K.D. crying out of fear caused Ms. Leith great emotional pain and suffering. To avoid having K.D. being taken into the custody of police, Plaintiff pleaded to be able to call K.D's father.

31.     At no point, during the stop or at the scene, did Defendant Nassau County Police Officers give Ms. Leith any traffic tickets or announce or even suggest that she had committed any traffic and/or vehicle violations.

32.     Once Ms. Leith's son's father arrived, he took custody of K.D. but not before K.D. witnessed his mother be arrested, handcuffed and treated without any level of dignity or human regard to which she was entitled.  Ms. Leith remained in handcuffs with her hands behind her, and was placed in the NCPD police car, and then taken to Defendant County's Police Department First Precinct in Baldwin by Defendant Sovaras and NCPD Officers.

33.     During the time Ms. Leith remained in handcuffs, she informed the police that she was in excruciating pain from the positioning of the handcuffs because she had a shoulder injury. Plaintiff requested that Defendant Police Officers adjust the cuffs.

34.     Not only did Defendant Officers refuse to take action at the time of the request, but Defendant NCPD Officers refused throughout to adhere to her requests to adjust the cuffs. Defendant NCPD Officers would not adjust or take Ms. Leith out of the handcuffs until approximately three (3) hours later.

35.     During that three (3) hours, Plaintiff was in extreme pain and unable to gain any relief. At that time, a female NCPD officer, whose is now known as Defendant Reid, took physical custody of Plaintiff for the purpose of conducting a wrongful and unlawful strip search. Defendant Reid was present throughout the entire time Plaintiff was requesting her cuffs to be adjusted or taken off. Such a delay was intentional, callous, and unnecessary.

36.     NCPD recognizes and defines "Strip Search" as "the removal or rearrangement of any clothing which permits inspection of the genitals, buttocks, anus, or female breasts." [1]

37.     Pursuant to Nassau County Police Department rules, the conducting of strip searches are to be conducted only when: "there is reasonable suspicion that a person is concealing a weapon, dangerous instrument, contraband, evidence of an offense, or any other instrument, article or substance that may facilitate escape, and there is no other reasonable method to obtain the items unless a strip search is undertaken without delay."[2]

38.     Defendant Reid magnified the traumatic experience by commanding Ms. Leith to completely disrobe and remove all of her clothes and jewelry while her private body parts were invasively and wrongfully checked. Ms. Leith was in utter humiliation and shock as she felt that the strip search was extremely demeaning, especially since she had committed no crime and knew she could not have had an outstanding state warrant for her arrest.

39.     There was no reason or justification for Ms. Leith to be subjected to a strip search. This unreasonable, incursive and unwarranted strip search was in violation of Ms. Leith's rights.

40.     This furthered the humiliation and embarrassment Ms. Leith had to wrongfully endure. None of which was authorized by law or justified in any way.

41.     Upon information and belief, there was no entry into the records systems of the NCPD or any command record of all the facts and circumstances that detail any reasonable suspicion necessary to justify the strip search of Plaintiff. Any such claim of suspicion and any entry would be a manufactured and false entry and would be contrary to law and the rights of Plaintiff.

---

[1] Article 17, Rule 3.3(b) of the NCPD Rules relating to Prisoner Search and Strip Searches.

[2] Article 17, Rule 3.3 ( c) of the NCPD Rules relating to Strip Search Justification.

42.     Defendant NCPD Officers, including but not limited to Defendant Sovaras, informed Ms. Leith that they were continuing to detain her until the New York State Trooper(s) arrived because she had an outstanding state warrant of over a year.

43.     After being wrongfully detained by Defendants County and NCPD Officers for approximately four (4) hours, Defendant New York State Trooper, now known to be Defendant Aziz (Badge #171), arrived at the NCPD First Precinct to continue Ms. Leith's wrongful and volative confinement.

44.     It was not until this time that Defendant K. Sovaras gave Ms. Leith the trumped up, false, fabricated and malicious vehicle violation tickets. Defendant Sovaras then said to Ms. Leith, in sum and substance: "At least you don't have a warrant in your name anymore, it's cleared."

45.     Once again, Ms. Leith was confused as to what warrant Defendant Sovaras was referring and how it being "cleared" did not result in her immediate release.

46.      Initially, Defendant Aziz (Badge #171)transported Ms. Leith to the New York State Trooper Headquarters for her to be processed. Ms. Leith was wrongfully confined at the Headquarters for approximately two (2) to three (3) hours.

47.     Then, Defendant Aziz (Badge #171) transported Ms. Leith to a state Detention Center because he stated that Ms. Leith had no bail and had to see a judge for release.

48.     To further Plaintiff's anguish, while at the state Detention Center, other NYS Troopers present asked Defendant Aziz (Badge #171) why Plaintiff was there because there was no record of a warrant for Plaintiff's arrest.

49.     In fact, another New York State Trooper stated, in Ms. Leith's presence, in sum and substance, "I told the other asshole (Police Officer) from Nassau that the warrant was vacated since

8

September."

50.     Defendant Aziz (Badge #171) replied stating "My partner probably took the warrant out [the system] because we caught her." This was the farthest thing from the truth as the other NYS officer said only a judge could do that.

51.     To give some background, Ms. Leith had only one prior offense before this wrongful arrest. On August 28, 2020 Ms. Leith was charged with DWI. A bench warrant was issued for Ms. Leith on August 25, 2021 which was vacated by the Hon. Chris J. Coschignano upon Ms. Leith's appearance on September 20, 2021. Ms. Leith plead guilty to a lesser charge on September 28, 2021 and was ordered to pay fines and complete an alcohol treatment program. Ms. Leith paid all of her fines and completed her treatment program on November 10, 2021.

52.     Any claim of an outstanding New York State warrant of on December 7, 2021 for Ms. Leith's arrest was a fabrication and untrue.

53.     In light of those facts and hearing what the state troopers were saying, the fear and pressure of it all, made Ms. Leith become frantic and she began to cry. Ms. Leith's anxiety started to race as she was confused and terrified as to the reason she was being subjected to a level of mistreatment by Defendants that stripped her of her dignity which was unexpected and unauthorized.

54.     Ms. Leith remained in handcuffs, in custody, and in fear of her safety and well being for an additional one (1) to two (2) hours. During her detention, Ms. Leith was placed in an empty cell that was freezing cold. She was not supplied with any blanket, was made to feel lonely, scared and had to compose herself before she potentially fainted due to the stress she was enduring.

55.     Ms. Leith had to suffer through Defendants' actions although she did nothing wrong.

56.     After over eleven (11) hours of wrongful arrest, wrongful confinement, being strip searched and being falsely imprisoned, Defendant Aziz (Badge #171) placed Ms. Leith in a NYS Trooper car took her to a Trooper Barracks where she remained for a period of time and then was taken to a Nassau County facility where she was placed in a cell,  questioned,  and eventually told she was being released.

57.     After the passage of time and being in that third police premises/detention center and placed in a cell, Plaintiff was then turned over to the Defendant Aziz (Badge #171) again, who returned to the place where he had left Plaintiff and then drove Ms. Leith to her residence at approximately 4 a.m. on December 8, 2021.

58.     Despite the clear false arrest and abuse to which Plaintiff was subjected, no one took the time to explain what had transpired to lead to the deprivation of Ms. Leith's liberty and apologize to her and her son K.D. for the horror to which they were subjected.

59.     While being transported to her home, by Defendant Aziz (Badge #171) Ms. Leith was finally offered food and a beverage, which was clearly an attempt to cover up the wrongs committed collectively by Defendants.  No apology was offered.

60.     Following her release, on or about December 9, 2021, Ms. Leith went back to NCPD First Precinct and requested proof and some form of documentation of her seizure, jailing and being wrongfully and unlawfully arrested and violated.

61.     To her great insult, surprise and dismay, Defendant County Police Officers refused to engage with Ms. Leith and rebuffed her request to provide documentation and instead stated that they could not provide any paperwork and that if she wanted any type of paperwork, she had to "file a FOIL (Freedom of Information Law) request"  to obtain such information.

62.     After having her freedom taken from her, being issued false and fabricated tickets as a cover up, being jailed, being handcuffed, being made to suffer pain, being subjected to an invasive strip search, being placed in a jail cell, being subjected to cold and deplorable physical conditions, and deprived of her family and home, Ms. Leith was denied any documentation or any form of proof that she was taken out of the general society for a period of approximately eleven hours on December 7-8, 2021.

63.     Plaintiffs, Ms. Leith and her infant son K.D.'s mental and emotional states are forever changed for the worst.

64.     Now when Ms. Leith sees police vehicles and officers on the road, she is in constant fear of being pulled over, arrested, and strip searched for no lawful reason.

65.     To cope with the trauma caused by Defendants, Ms. Leith as well as her son K.D., had to seek therapy.

66.     Although therapy has provided some help, due to the limitations of her insurance coverage, Ms. Leith has had to reduce the frequency of her therapy sessions because she was no longer covered for the much needed two sessions a week.

67.     On December 7, 2021 Ms. Leith and her son K.D. were victimized and subjected to racial profiling and should have never been wrongfully stopped and pulled over without probable cause by Defendants. Plaintiffs should not have been forced to experience the deprivations which were thrust upon them.

68.     On December 7-8, 2021, Ms. Leith should have never been wrongfully arrested with excessively tight handcuffs by Defendants. K.D. should not have been forced to see his mother in handcuffs for no lawful reason.

69.     On December 7, 2021, Ms. Leith should have never been wrongfully strip searched by Defendant Reid. Such an unlawful, invasive, and demeaning experience had never occurred to Ms. Leith before, and it should have never happened.

70.     Ms. Leith should have never been wrongfully confined and deprived of her freedom for eleven (11) plus hours without Defendants having any valid warrant.

71.     Plaintiff was subjected to racial profiling, being stopped, arrested and strip searched without legal cause or justification. Defendant County through Defendant K. Sovaras and Defendant Reid, intentionally targeted and racially profiled Ms. Leith on the basis of her being African American. Inexplicably, Defendants Sovaras did such under the guise of having a phantom state arrest warrant, all while improperly training other NCPD Officers. The unlawful arrest, unlawful confinement and abuse committed by Defendant NCPD was continued and furthered by Defendant Aziz (Badge #171) who would detained Ms. Leith unlawfully for several additional hours.

72.     Prior to Plaintiff being stopped and required to provide her license, she had committed no crime or violation of law. There was no reasonable basis upon which her stop by Nassau County Police, including but not limited to Defendant K. Sovaras and other NCPD Officers, was justified or supported.

## *NASSAU COUNTY AND THE NASSAU COUNTY POLICE DEPARTMENT'S RACE BASED POLICING*

73.     The improper and unlawful stop, detention and arrest of Plaintiff was race based and was consistent with the ongoing pattern and practice of Nassau County Police to unjustifiably claim crimes by African-American persons at a level which demonstrates a disparate racial impact which supports that Nassau has a history of arresting African-American persons at a rate which statistically

reveals the fact of racial discrimination in arrests which negatively and improperly impacts the rights of African-American persons like Plaintiff.

74.     Nassau County Police Department and Nassau County has known that their officers have engaged in a pattern of arresting African-Americans at a disproportionate level as compared to Whites. Prior to Plaintiff's stop and arrest, Nassau County Police and Nassau County knew that in the year 2018, White persons made up approximately 59.6% of the total population of the County Nassau, and that Black persons made up approximately 11.1% of the population of Nassau County. Based on data from Nassau County 6,219 White persons were arrested in the year 2018 and 5,509 Black persons were arrested by Nassau County Police. The evaluation of those numbers demonstrates that in the year 2018, the arrest cohort ratio of Black persons to White persons was 4.7 to 1.0.

75.     Nassau County Police Department and Nassau County has known that their officers have engaged in a pattern of arresting African-Americans at a disproportionate level as compared to Whites. Prior to Plaintiff's stop and arrest, Nassau County Police and Nassau County knew that in the year 2019, White persons made up approximately 59.6% of the total population of the County Nassau and that Black persons made up approximately 11.1% of the population of Nassau County. Based on data from Nassau County, 5,192 White persons were arrested in the year 2019 and 5,136 Black persons were arrested by Nassau County Police. The evaluation of those numbers demonstrates that in the year 2019, the arrest cohort ratio of Black persons to White persons was 5.3 to 1.0.

76.     Based on the Nassau County Arrest Data analyzed in the chart below, Nassau County knew or reasonably should have known that its police were arresting African-American persons at

a level which demonstrated race based arrests by its police department.

| NCPD Arrest Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cohort | Asian | Black | Hispanic | Other | White | Unknwn | Total |
| Population (2017 est) | 133,666 | 152,447 | 234,881 | 32,377 | 816,143 | N/A | 1,369,514 |
| % Total Population | 9.8% | 11.1% | 17.2% | 2.4% | 59.6% | N/A | 100.0% |
| 2018 Arrests | | | | | | | |
| Male | 402 | 4,118 | 2,805 | 253 | 4,639 | 205 | 12,422 |
| Female | 166 | 1,391 | 779 | 54 | 1,580 | 31 | 4,001 |
| Combined | 568 | 5,509 | 3,584 | 307 | 6,219 | 236 | 16,423 |
| Cohort % of Total | 3.5% | 33.5% | 21.8% | 1.9% | 37.9% | 1.4% | 100.0% |
| Cohort Frequency Rate | 0.00425 | 0.03614 | 0.01526 | 0.00948 | 0.00762 | | |
| Cohort Ratio : Whites | 0.6 | 4.7 | 2.0 | 1.2 | 1.0 | | |
| | | | | | | | |
| 2019 Arrests | | | | | | | |
| Male | 560 | 3,839 | 2,722 | 74 | 3,893 | 14 | 11,102 |
| Female | 229 | 1,297 | 748 | 10 | 1,299 | 3 | 3,586 |
| Combined | 789 | 5,136 | 3,470 | 84 | 5,192 | 17 | 14,688 |
| Cohort % of Total | 5.4% | 35.0% | 23.6% | 0.6% | 35.3% | 0.1% | 100.0% |
| Cohort Frequency Rate | 0.00590 | 0.03369 | 0.01477 | 0.00259 | 0.00636 | | |
| Cohort Ratio : Whites | 0.9 | 5.3 | 2.3 | 0.4 | 1.0 | | |

Population data source: http://www.city-data.com/county/Nassau_County-NY.html

77.     The arrest data for the year January 2021 through December 2021[3] provides an even more concerning statistical picture.

| Arrest Demographics | Male | Female | Unknown/ Other | Total | % of Total |
|---|---|---|---|---|---|
| American Indian/Alaskan Native | 26 | 4 | 0 | 30 | 0.3% |
| Asian/Pacific Islander | 471 | 134 | 0 | 605 | 5.9% |
| Black | 2,812 | 844 | 0 | 3,656 | 35.6% |
| Hispanic/ Latino | 2,054 | 523 | 0 | 2,577 | 25.1% |
| Other | 0 | 1 | 0 | 1 | 0.0% |
| Unknown | 0 | 3 | 0 | 3 | 0.0% |
| White | 2,529 | 871 | 0 | 3,400 | 33.1% |
| Total | 7,892 | 2,380 | 0 | 10,272 | 100.0% |

[3] Reported by Long Island United Police Accountability Working Group in their report entitled, Monitoring Police Reform in Nassau County, October 2022 which used data issued by Nassau County.

78.   As demonstrated by the chart above[4] the actual number of Black/African-Americans arrested in the year 2021 exceeded the number of Whites arrested despite the Black community making up only 10.6% of the Nassau County's total population.[5]  For the years 2018, 2019 and 2020 the racial disparity of arrests between Blacks and Whites in Nassau County increased despite the fact of these disparities being known to Nassau County and the NCPD.

79.   In the matter of traffic stops, which is what led to Ms. Leith's false arrest, upon information and belief, Black people in Nassau County are 4.2-5.6 times more likely to be stopped than White people. Upon information and belief, in Nassau County Latino individuals are 4.1-5.5 times more likely to be stopped than White people.

80.   Rather than address the clear racial disparities in traffic stops and arrests, the Commissioner of the NCPD asserted at a hearing before the Nassau County Legislature that the data from his department should be explained by his supposition that many non-white residents may be entering the county and "[coming] here to commit some kind of criminal act."[6]

81.   Data clearly shows that the NCPD has failed to address its mandated requirement and stated commitment to reducing racial bias in policing.[7] Across nearly all dimensions including Arrests, Field Interviews (FI), Use of Force, and Vehicle and Traffic Law (VTL) stops, racial bias

---

[4] The chart provided is a direct copy of sections of reports issued publicly by Nassau County.

[5] According to Nassau County, the population data used was from the 2020 census.

[6] https://www.wshu.org/long-island-news/2022-02-04/nassau-police-say-non-residents-are-causing-racial-enforcement - disparity-data-suggests-otherwise

[7] New York State Executive Order 203 was issued as a means of addressing "racially-biased law enforcement [and] to demand change, action, and accountability"16 in the wake of the murder of George Floyd.  The NCPD, in response, developed a plan that it claimed would continue "robust community-oriented policing strategies while working toward further reducing racial disparities in policing."

is prevalent.

82.    A careful review of the data reveals no empirical justification for relevant racial disparities.

83.    According to available data[8], in Nassau County, upon information and belief, Black people are  subject to traffic stops at 3.1 times the rate of White people; Black people are subject to Terry Stops at 4.7 times the rate of White people; and Black people are subject to being frisked at 6.8 times the rate of White people.

84.    Combined, these findings provide compelling indicia of the impermissible consideration of race as a factor in discretionary enforcement actions by NCPD.

85.    In Nassau County it is implausible that Black people are inherently three times more inclined than white people to commit traffic violations and/or to engage in criminal conduct.

86.    Nassau County has refused to address serious concerns of biased policing within its Police Department even in the face of official opportunities to do so.

87.    The willingness and efforts of Nassau's elected officials, as well as its Police Commissioner, to discuss and acknowledge racial disparities in policing is not only a pattern, it has been consistent with its decision makers.

88.    On Monday, March 22, 2021 on the floor of the Nassau County Legislature, Legislator, Carrie Solages raised questions about the statistical disparities in arrest of Black person as compared to the white population in Nassau County.

---

[8] Unlike many law enforcement agencies, including neighboring SCPD, NCPD does not provide public access to source enforcement data in delimited text digital format. That prevents meaningful interrogation of the data.  In addition, the data that NCPD did release did not include metrics by cohort for each enforcement activity. That limitation prevents calculation of cohort frequency rates.  Further, upon and information belief NCPD does not maintain, or has not made public it's data as to strip searches of person taken into custody.

89.     When Legislator Solages asked for answers from Commissioner Patrick Ryder, his

questions relating to racial disparities were not acknowledged and his questions were rejected by the

Presiding Officer in that the sitting Legislator representing a largely Black and Brown community

was told that the Police Commissioner was not going to answer the questions posed.

90.     The following is an excerpt from those proceedings on March 22, 2021:

LEGISLATOR SOLAGES: But they're saying, reasonably, that is a clear example of a racist institution. Point blank, an arrest rate of 5.3 Black males to White males is that a symptom, quality or reflection of an institution that is racist?

COMMISSIONER RYDER: If that institution is the Nassau County Police Department I said to you before and I'll say it again no, it's not. Our car stops, our arrests are all based on probable cause. They don't get thrown out when they go to court. It's not like the DA is saying all these cases got to get thrown because there was no probable cause to make the arrest. It's an evidence-based approach, it's probable cause and then the arrest is made. We equally disburse –


LEGISLATOR SOLAGES: But Blacks do not account for anywhere the number of people in this county compared to Whites but they are arrested 5.3 times more likely. How do you explain for that sir?

COMMISSIONER RYDER: Again, we base all of our arrests on probable cause. Once probable cause has been committed, a crime has been committed --

LEGISLATOR SOLAGES: And racial biases don't play a role in that?

COMMISSIONER RYDER: Not at all.

LEGISLATOR SOLAGES: How can you be in a position to change history of racism if you're not even acknowledging it? Listen to the question. Work with me here.

LEGISLATOR NICOLELLO: He's not answering that question.

LEGISLATOR SOLAGES: Sir, you've allowed me the chance to speak. I'm speaking. Thank you very much but please do not interrupt.

LEGISLATOR NICOLELLO: But he's not answering that question.

LEGISLATOR SOLAGES: Please, help me to explain this to my son, my seven year old son,

a Black male, how am I going to explain to him that he would likely not be able to be arrested when the arrest rate at now is 5.3 compared to one. Help me explain that to him.

LEGISLATOR NICOLELLO: That's not a question.[9]

91.     Not only did Commissioner Ryder refuse to acknowledge the problems being asked about by Legislator Solages on March 21, 2021 that the NCPD's own data showed a 5.3:1.0 Black to white arrest disparity, neither he nor the Nassau County Executive responded to written inquires made to them asking them to address these racial disparities.

92.     If there were a sincere interest in evaluating the facts and engaging in finding answers and solutions to address the racial issues raised by these numbers, the County was provided opportunities to do so and has intentionally failed and refused to do so.

93.     Nassau County and Defendants have continued to support the actions of those espousing racially biased views within the NCPD with no attempt to address or correct that behavior. None of this is more evident than in Defendants' continued support of Commissioner Patrick Ryder.

94.     After being presented with Newsday's findings, Ryder, in a widely denounced interview, attributed the lack of non-white NCPD officers to the purported presence of "broken homes" or to a lack of parental support in their communities. Ryder stated that "[t]hese kids struggle in these communities because they don't have both parents around"; that he "can't fix the family home, but I can fix the kid"; and that "giving kids a little advantage in some of the minority communities is important too," because "[t]hey don't have mom and dad."

95.     Ryder also invoked racial stereotypes to defend the NCPD's lack of diversity, stating, "When we look at diversity in the police department, you've got to go look at other employments

[9] *Transcript of the NASSAU COUNTY LEGISLATURE,  RICHARD NICOLELLO PRESIDING OFFICER, LEGISLATIVE SESSION*, Monday, March 22, 2021, pages 87-89.

around the country. What's the percentage of Asians that are in the doctor world? What is the percentage of lawyers that are Jewish?"

96. Following these insensitive and uninformed comments by Ryder, many members of the Nassau community called for the County to take actions that would hold Ryder accountable for his statements and sought his resignation. Nassau County refused to take any action the would hold him accountable, and he refused to resign.

97. Furthermore, when asked how he would devise the perfect process for hiring police officers-and fully aware of the discriminatory results of the existing process, Ryder responded, "I like the process that we do now."

98. Unfortunately, Commissioner Ryder is alleged to have made even more troublesome statements in the past. As reported by Gothamist, "[a] retired officer[] said in a sworn deposition taken October 25[, 2021,] that in 2015, when [the officer] was still on the force and Ryder was a sergeant, Ryder referred to a then-police officer Dolores Sharpe [a Black female] as an '(expletive) N-word.'"

99. After news outlets reported on this deposition testimony, and after a coalition of civil rights and police organizations called for Commission Ryder to resign, the Nassau legislature approved a $650,000 offer of judgment to Ms. Sharpe, who accepted the offer after years of litigating her federal race discrimination lawsuit.

100. As Gothamist further explained, "[l]ater in the deposition, [the officer] was asked if he reported Ryder's use of the slur to the department. [The officer] answered that he did not. 'I was basically in fear that if I reported it, retribution would follow,' [the officer] said in the deposition."

101.     Indeed, as Gothamist further explained, "Ryder, who was a sergeant at the time, would be promoted to assistant commissioner the following year.  He was named acting commissioner in 2017, and confirmed as commissioner in 2018."

102.     Ryder's and NCPD's problematic animus limited to individual actors.  As Newsday reported in 2018, as recently as a few years ago, the NCPD used a single-letter system to denote the races of its officers: B, H, I, W and Y, where "I" stands for Indian- for Native American officers- and "Y" for Asian-American officers.

103.     As the director of the New York Civil Liberties Union's Nassau chapter, who blew the whistle on this problematic practice, explained, using "'yellow' to describe Asian-Americans is 'obviously derogatory,'" and "[l]anguage is a real indicator of the culture of an institution."

104.     The only publicly reported NCPD traffic stop data is that which is included in NCPD's Police Reform Executive Order (EO) 203 Reports.

105.     The analysis that follows is of data reported in Police Reform EO 203 2022 Year End Follow-Up Report. Relevant Traffic-Stop (T-Stop) data is captioned "Summons Data" on p. 18 of 21.[10]

106.     NCPD has demonstrated that it has the ability to capture and calculate detailed stop and stop subject criteria. In spite of that capacity, the NCPD chooses to limit its reporting to the aggregate number of total stops, warnings, "Summons Issued," "Other," and "# of Summonses" by gender and racial/ethnic cohort.

---

[10] The reported data is deliberately and woefully inadequate.  The report emphasis that "Non Residents make up 41.1%" of "the number of summonses" issued is noteworthy as an attempt by Nassau County to avoid addressing the issue of race and the disproportionate number of stops of persons of color in Nassau County.

107.     NCPD does not report traffic stop predicates (stop reasons) by cohort, ensuing discretionary enforcement actions taken (vehicle search, person search, removal from vehicle, placement in the back of police cars, use of restraint, use of force, canine deployment) by cohort or all stop outcomes (arrest, charges, etc.) by cohort.[11]

108.     Assessing bias in discretionary traffic stop activities is a bifurcated process. Bias is assessed in initial stop decisions separately from bias in post-stop outcomes. Assessing bias in stop decisions requires discrete values by cohort for each category of stop predicate (stop reason), particularly stops that are considered 'investigatory' or 'pretextual.' Assessing bias in stop outcomes requires discrete values by cohort for each type of discretionary enforcement action. The most reliable indicia of bias in discretionary post-stop outcomes are complementary disparities in search rates (vehicle searches, person searches, and protective frisks) and contraband (drugs, weapons, etc.) recovery rates, which are referred to as hit rates.

109.     NCPD notably provides no search data so that assessing bias can be properly evaluated. Doing so shields NCPD's discretionary enforcement practices and differential and disparate treatment from meaningful scrutiny.

110.     A review of the incomplete, fragmented and disjointed T-Stop data reported by NCPD (Jan. 1 - Dec. 31, 2022) provides a very telling and disturbing truth. Black and Latino persons are stopped, ticketed, and subjected to police contact at an alarmingly high rate compared to white persons. The evaluation of the numbers which have been made public show that there is

---

[11] NCPD's presentation of T-Stop data is deliberately structured to preclude relevant comparative analysis. Probative analysis requires comparative analysis of discrete cohort frequency rates. The U.S. Department of Justice, Professor Frank Baumgartner UNC at Chapel Hill, author of Suspect Citizens: What 20 Million Traffic Stops Tells us About Policing and Race, and RAND Corp. rely on comparative analyses of cohort frequency rates to assess the influence of impermissible bias in discretionary stop decisions and discretionary post-stop outcomes.

a clear disparity in traffic stops by race and ethnicity:

*Blacks are stopped at 3.1 times the rate of whites:
    *87.6 per 1,000 Black residents vs. 28.7 per 1,000 white residents

*Latinos are stopped at 2.3 times the rate of whites:
    *65.8 per 1,000 Latino residents vs. 28.7 per 1,000 white residents

111.    The chart below illustrates the comparison of T-stop numbers by race and ethnicity in Nassau County.



112.    The evaluation of the numbers which have been made public show that there is a clear disparity in summons issued per traffic stop by race and ethnicity:

*Blacks are ticketed at 3.0 times the rate of whites:
    *52.2 per 1,000 Black residents vs. 17.5 per 1,000 white residents

*Latinos are ticketed at 2.6 times the rate of whites:
    *44.7 per 1,000 Latino residents vs. 17.5 per 1,000 white residents

113.    The chart below illustrates the comparison of summonses issued per T-stop by race and ethnicity in Nassau County.



Avg. # of Summonses Issued by NCPD by Race/Ethnicity - 2022

114.     The evaluation of the numbers which have been made public show that there is a clear disparity in the volume of tickets issued to Black and Latino persons as compared to whites per traffic stop which can be measured by race and ethnicity. Those disparities present themselves to be:

*On average, Blacks are issued 3.3 tickets per instance; Latinos are issued 3.0 tickets per instance; and whites are issued 2.1 tickets per instance.
        *Blacks receive a volume of tickets which is 54% greater than whites on average; Latinos receive a volume of tickets which is 40% greater than whites on average.

115.     The alarming rate at which Black and Latino persons are subjected to "field interviews" as compared to white persons as calculated utilizing NCPD's incomplete data, displays facts that cannot be explained away as happenstance. The chart below provides a visual of what is happening to Black and Latino person as they drive in Nassau County.



**NCPD Field Interviews by Racial / Ethnic Cohort, 2022**

116.    NCPD's Police Reform EO203 Year End Follow-Up Report for 2022 indicates that NCPD conducted 1,616 field interviews of Blacks, 1,184 field interviews of Latinos and 1,535 field interviews of whites in calendar year 2022.

117.    In 2022, NCPD field interviewed 8.9 Blacks per 1,000 Black residents, 4.9 Latinos per 1,000 Latino residents and 1.9 white residents per 1,000 white residents. On a comparative basis, NCPD subjected Blacks to field interviews at 4.6 times the rate of whites and Latinos at 2.5 times the rate of whites. The disparity increases when controlling for field interviews in which the stop subjects were frisked. That evaluation finds that NCPD frisked Blacks at 6.4 times the rate of whites and Latinos at 3.2 times the rate of whites.[12]

118.    Blacks were subjected to the use of force during routine traffic stops at 11.3 times the rate of whites, Latinos at 0.8 times the rate of whites. Additionally, Blacks were subjected to

---

[12] To calculate the residential population-based rate at which members of the respective cohorts (cohort frequency rate) are subjected to discretionary field interviews, the process is to divide the number of individuals of each cohort subjected to field interviews by the number of members of that respective cohort in Nassau County's residential population - and adjust it on a per-1,000 residents basis.

"Physical Force" at 4.3 times the rate of whites overall, Latinos at 0.4 times the rate.

119. Based on the data released by NCPD Blacks were subjected to the use of Electronic Conducted Weapons at 3.6 times the rate of whites, Latinos at 0.7 times the rate.

120. Based on the data released by NCPD they displayed weapons towards Blacks at 9.8 times the rate of whites, Latinos at 0.4 times the rate.

121. Based on the data released by NCPD Blacks were subjected to canine deployments at 30.7 times the rate of whites, Latinos were subjected to none.

122. Based on the data released by NCPD Blacks were subjected to "Multiple" types of force at 5.8. times the rate of whites, Latinos at 0.8 times the rate.

123. The differences in the above-referenced outcomes for Blacks and Latinos versus white persons in traffic stop related police contact is stark and is not the result of mere chance. The share of Black and Latino persons who suffer adversely and disproportionally at the hands of NCPD at all measurable levels of police contact in arrests and T-stops (including the components related to those stops) is significant as compared to white persons.

124. In short, based on the presently available data there is no reason to believe that the abysmal pattern and practice of the NCPD will change from the actions of the officers to the reporting of the actions of the officers.

125. Likewise, Nassau County and the NCPD have demonstrated no interest, willingness or effort to reform itself to address the clear disparities in their patterns, practices and customs of treating persons differently based on race, color and ethnicity.

126. Defendant Sovaras, Defendant Reid, and Defendant New York State Trooper Aziz (Badge #171) abused their authority by arresting, confining and detaining Ms. Leith. In doing so,

Defendants caused serious and unjustifiable harm to Ms. Leith and her infant son, K.D.

127.    All Defendants acting under the color of law, and it is based on the fact alleged herein, Plaintiff asserts the following causes of action against Defendant Sovaras, Defendant Reid, and Defendant New York State Trooper Aziz (Badge #171)

128.    In addition to experiencing the abuse of being falsely arrested, jailed, cuffed, strip searched, denied her liberty and being the victim of race based mistreatment, Ms. Leith was required to address the tickets which were issued to her for the purpose of covering up the wrongful actions of Defendants Sovaras and other NCPD officers.

129.    The issuance of those tickets and underlying claims made in those tickets were a pretext for discrimination and race based mistreatment as is often the case in Nassau Police stops of African-Americans and Latino persons.

130.    Those tickets required Ms. Leith to appear in Court, hire counsel and fight those summons which were pretextually and maliciously issued.  As of November 9, 2022, both trumped up vehicle violation tickets given to Ms. Leith by Defendant Sovaras were dismissed outright and concluded the malicious and pretextual charges leveled against her

## CLASS ACTION ALLEGATIONS

131.    This class action is brought pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability-phase injunctive and declaratory relief on behalf of a class of all Black and Brown residents and persons in the County of Nassau,  who are operators of motor vehicles,  are subject to this level and type of discriminatory and race based policing,  and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons in violation of § 1983 the NYSHRL and other laws

and statutes. Plaintiffs reserve the right to amend the definition of the Class based on discovery or other factual or legal developments.

132. Plaintiffs also bring this Class Action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) seeking monetary damages and other make-whole relief on behalf of a Class of all Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers are subject to this level and type of discriminatory and race based policing, and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons in violation of § 1983 the NYSHRL, and other laws and statutes. Plaintiffs reserve the right to amend the definition of the Class based on discovery or other factual or legal developments.

133. Plaintiff Leith is a member of the Class she seeks to represent.

134. The members of the Class identified herein are so numerous that joinder of all members is impracticable. The County of Nassau has not produced via FOIL up-to-date data on the traffic stops and raw data as has been requested by community police reform advocates. Nassau County has attempted to thwart the ability of Plaintiff and this proposed class from obtaining the data and information sought relating to traffic stops, searches, detentions, arrests and other actions by police taken toward and against Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers and are subject to this level and type of discriminatory and race based policing and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons. On information and belief, the percentage of Black and Latino person who make up the population of Nassau County is approximated to be between 10 to 12 percent and 16 to 18 percent

respectively of the total population of Nassau County. The class includes those persons as well person of color who are not residents within the County of Nassau who are subjected to discriminatory treatment while driving in Nassau County. The class is expected to grow significantly, based on, *inter alia*, the fact that once accurate data is provided and properly analyzed a more accurate number can and will be determined.

135. There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members, including:

(a) Whether Defendants' policing in Nassau County has been and continues to demonstrate disparate levels of discrimination based on race and supports that Nassau discriminates against non-white persons in its traffic stops, actions taken in those stops and outcomes as to those stops;

(b) Whether Defendants' policing in Nassau County policies and practices for traffic stops, actions taken in those stops, and outcomes as to those stops in Nassau County violate § 1983 and/or the NYSHRL and other statutes and laws;

( c) Whether Defendants, using as a pretext of minor vehicle and traffic law violations and other excuses and fictions, intentionally discriminate against Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers are subject to this level and type of discriminatory and race based policing in Nassau County;

(d) Whether Defendants' practices have a disparate impact on non-white persons who are operators of motor vehicles and/or passengers are subject to this level and type of discriminatory and race based policing in Nassau County; and

(e) Whether equitable remedies, injunctive relief, and other relief for the Class are warranted to address the discriminatory effects of Defendants' misconduct.

136. The claims of Plaintiff Leith are typical of the claims of the Class.

137. Plaintiff Leith will fairly and adequately represent and protect the interests of the members of the Class.

138. Plaintiff has retained counsel competent and experienced in complex class actions, police misconduct and racial discrimination litigation, and the intersection thereof.

139. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a whole. The Class Members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

140. Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class Members have been damaged and are entitled to recovery as a result of Defendants' common, uniform, unfair, and discriminatory policies and practices.

## AS AND FOR A FIRST COUNT
## 42 U.S.C. § 1983 - FALSE ARREST AND MALICIOUS PROSECUTION

141. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 140 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

142.     The accusations of wrongful conduct against Plaintiff Leith were improper and false, and were an attempt to disguise and coverup the wrongful acts and race based actions of the Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), causing a deprivation of Plaintiff's rights, privileges, and/or immunities secured by the Constitution and laws.

143.     Under color of the law, the Defendants deprived the Plaintiff Leith of her Fifth, Sixth and Fourteenth Amendment rights not to be deprived of life, liberty, or property without due process of law, and of her Fourth Amendment right to be free from unlawful searches and seizures by falsely arresting, wrongfully detaining, searching person and property, unlawfully assaulting, malicious prosecution, unconstitutionally conducting a strip search, and falsely holding Plaintiff for no reason and for which there is no evidence or substantiation of any kind.

144.     On December 7, 2021, Plaintiff Leith was placed in fear of her life, falsely seized, falsely detained and falsely arrested issued pretextual and malicious summons after realizing that their arrest and false allegations made would not withstand scrutiny including the action of defendants subjecting Ms. Leith to painful excessive and unreasonable force, demeaning and dehumanizing actions and unlawful search and seizure.

145.     On December 7, 2021, Plaintiff Leith was placed in fear of her life, falsely arrested, falsely seized, detained, and held for an unreasonable period of time against her will without justification, explanation or rationale for such detention.

146.     On December 7-8, 2021, while Plaintiff Leith was being detained, Defendant Officers refused to provide information and documentation about her wrongful arrest and prosecution and placed Plaintiff in a state of horror and terror which was elevated upon the use of tickets at act as a

pretext for her arrest and detention.

147.    Upon information and belief such continued seizure, arrest and issuance of the pretextual tickets was ordered and was carried out by Defendant County and Defendant Officers with a callous, deliberate indifference to Plaintiff's known constitutional rights. The false charges leveled against Plaintiff were issued to her for the purpose of covering up the wrongful actions of Defendants Sovaras and other NCPD officers. The tickets and charges were all dismissed.

148.    The issuance of those tickets and underlying claims made in those tickets were a pretext for discrimination and race based mistreatment as is often the case when Nassau Police stop African-Americans.

149.    The accusations of wrongful actions leveled against the Plaintiff were false and an attempt to cover up the false arrest, abuse of process which had been inflicted by Defendants on Plaintiff.  Defendants lacked probable cause to seize Plaintiff.

150.    Such actions were intentional, negligent, reckless, callous, unreasonable and unauthorized, as Defendants had a duty not to subject Plaintiff to the use of excessive force by conducting an unlawful strip search, and false arrest, all in violation of 42 U.S.A. §1983.

151.    The Defendants acted under color of law to deny the Plaintiff her Constitutional rights of due process and freedom from seizure by wrongfully detaining Plaintiff and others similarly situated under the threat of imprisonment without providing any reasonable basis or investigation warranting prosecution, or the depravation of other due process guarantees secured to the Plaintiff. The Defendants detained the Plaintiff without any probable cause, therefore lacking proper legal authority.

152. As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of her freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation. Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

153. In engaging in this treatment, Defendants caused serious and unjustifiable harm to Ms. Leith and her infant son, K.D.

154. Plaintiff and the Class requests relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A SECOND COUNT
## 42 U.S.C. § 1983 - FALSE IMPRISONMENT

155. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 154 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

156. The accusations of wrongful conduct against Plaintiff were improper and false, and were an attempt to disguise and coverup the wrongful acts and race based actions of the Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171) causing a deprivation of Plaintiff's rights, privileges, and/or immunities secured by the Constitution and laws

157. The Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), lacked probable cause to arrest or detain Plaintiff in prolonged physical custody for any period of time from December 7 - December 8, 2021.

158.     The wrongful stop and false detention of Plaintiff by the Defendants were committed under color of law, customs, and statutes of the State of New York.

159.     The Defendants acted under color of the law to deny the Plaintiff their Constitutional rights to equal protection, due process, and freedom from seizure by wrongfully detaining Plaintiff Leith on the street and in her vehicle while in Nassau County, New York, and wrongfully holding her under the threat of imprisonment for an indeterminate period of time, without providing a reasonable basis and/or investigation warranting custody, or other due process guarantees secured to the Plaintiff by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

160.     Such violations were continued by the Defendants in their refusal to adequately investigate the false charges against Plaintiff Leith and to properly review and investigate the actions of Defendants against Plaintiff Leith. Specifically, Defendants failed to investigate and verify the veracity of the alleged warrant and protestations of the abusive treatment to which Ms. Leith was subjected. Despite the blatant lack of any probable cause for wrongly stopping, detaining, and arresting Plaintiff Leith.

161.     Despite the information known to the Defendants at the time of the car stop, the Defendants willfully detained Plaintiff Leith without probable cause, or legal reason and for an unlawful period of time. Plaintiff Leith repeatedly asked for an explanation of the situation, but the Defendants never offered any significant response. Plaintiff Leith had to endure harassment and degrading questioning by the Defendants. The Defendants lacked the authority to stop, hold, search, hand cuff and transport Plaintiff Leith – there was no probable cause or reasonable suspicion to take Plaintiff into custody.

162. As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff Leith was deprived of her freedom for eleven (11) plus hours, made to suffer injuries, and were subjected to great fear, terror, personal humiliation and degradation, and still continue to suffer physical pain, mental and emotional distress as a result of the aforesaid unlawful conduct of the Defendants until Plaintiff's release.

163. In doing so, Defendants caused serious and unjustifiable harm to Ms. Leith and her infant son, K.D.

164. Plaintiff Leith and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A THIRD COUNT
## 42 U.S.C. § 1983 - UNREASONABLE SEARCH AND SEIZURE CLAIM

165. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 164of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

166. The unlawful arrest conducted against Plaintiff Leith by Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), constituted an unreasonable search and seizure by the police officers as well as abuse of process. Such actions were negligent, reckless, unreasonable and unauthorized, as Defendants had a duty not to subject Plaintiff Leith and her infant son, K.D., to any unnecessary search and seizure, but failed to prevent the same, and breached their duty as law enforcement officers.

167.     As a consequence of Defendants' wrongful actions, negligent behavior and violation of federal laws, Plaintiff was deprived of her freedom, was subjected to great fear, terror, personal humiliation and degradation, and suffered great mental and emotional distress as a result of the aforesaid unlawful conduct of Defendants.

168.     Defendant Reid failed to have any reasonable basis in order to establish a reason for a warrantees strip search of Plaintiff. Reasonable suspicion that the Plaintiff was concealing weapons or other contraband must be present to support a warrantees strip search.  There was no reasonable suspicion that the Plaintiff was concealing weapons or other contraband. Defendant Reid strip searched Plaintiff even though there was no individualized suspicion that she was secreting contraband on his person.

169.     Plaintiff and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

### AS AND FOR A FOURTH COUNT
### 42 U.S.C. § 1983- MUNICIPAL LIABILITY

170.     Plaintiff repeat and reiterate the allegations set forth in paragraphs 1 through 168 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

171.     By actively inflicting and failing to prevent the above stated abuses incurred by Plaintiff, all of the Defendants acted unreasonably, recklessly, and negligently in failing to exercise the slightest amount of due care to secure and protect the civil and constitutional rights of the Plaintiff against illegal search and seizure, physical abuse, detained custody and other due process

violations. Said rights are guaranteed to the Plaintiff by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

172.     Both before and after December 7, 2021, NASSAU COUNTY, Defendants Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), have systematically failed to identify the improper abuse, misuse, vocative acts by police officers and officials, while further failing to subject such officers and officials to discipline, closer supervision, and/or restraint.

173.     Upon information and belief, Defendants Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), the misconduct review process include but are not limited to the following:

a.     Preparing reports regarding investigations of unwarranted incidents as routine point-by-point justification of the police officers actions regardless of whether such actions are justified;

b.     Police officers investigating unwarranted incidents systematically fail to credit testimony by non-police officer witnesses and uncritically rely on reports by police officers involved in the incident;

c.     Police officers investigating unwarranted incidents fail to include in their reports relevant factual information which would tend to contradict the statements of the police officer involved;

d.     Supervisory police officers exonerate police officers for misconduct and abuse of process before the investigation of the incident by the police department has been completed;

e.     Reports in brutality cases are not reviewed for accuracy by supervisory officers. Conclusions are frequently permitted to be drawn on the basis of clearly incorrect or contradictory information.

f.     The County of Nassau hastily accepts the allegations of police in light of clear evidence of innocence, and accepts the allegations as provided from police reports regarding excuses for abuses and civil rights infringements, despite strong evidence

to suggest that the police reports are inaccurate, untruthful, and meant to conceal blatant police misconduct.

g.  Rather than address the clear racial disparities in traffic stops and arrests, the Commissioner of the NCPD asserted at a hearing before the Nassau County Legislature that the data from his department should be explained by his supposition that many non-white residents may be entering the county and "[coming] here to commit some kind of criminal act."

h.  Pretextual stops of persons of color is a known fact about which the County of Nassau has refused to address despite proof of the ongoing and regular practice.

I.  Nassau County Police Department has done little to combat the systematic bias embedded in the way in which policing is done.

174.  Defendant Nassau County and its Police Commissioner, Patrick Ryder, who is the decision maker and policy setter and the highest ranking police official in the NCPD has consistently refused to address the data in Nassau that shows racial disparities in how policing is done in Nassau County.

175.  What has been displayed by the County of Nassau is a callous disregard for inequities with regard to the treatment of Black and Hispanics that are supported by the data known to them in the areas of arrests, traffic stops, misdemeanor charges, felony charges, searches, auto searches, field interviews, and use of force.

176.  In fact, Commissioner Ryder has made race based and racially insensitive comments that show his own bias and unwillingness to recognize or address the failures of Nassau County and the NCPD or to take any meaningful actions to address the concerns demonstrated by the data.

177.  Nassau County has engaged in and allowed a systemic practice of racial discrimination and profiling of Black and Hispanic persons in its traffic stop, arrests and unlawful searches. This pattern and practice has been known by the County of Nassau. Despite them be

confronted with the disparities through their own numbers, through their reporting and it being pointed out by Legislative sources and community members verbally and in writing Defendant Nassau County and its agency NCPD have refused to address the clear racial disparities that exist.

178.    Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), failed to sufficiently investigate Plaintiff Leith and instead acted under color of statute to knowingly impose false allegations and subject Plaintiff Leith to abuse and violations of her rights.

179.    By permitting and assisting such a pattern of police misconduct, NASSAU COUNTY, Defendants Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), have acted under color of custom and policy to condone, encourage and promote the deprivation of Plaintiff's Fourth, Fifth and Fourteenth Amendment rights; to wit the Defendants NASSAU COUNTY, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171) were encouraged to believe that their actions against the Plaintiff would be accepted without impunity, just as these actions have been so accepted to date.

180.    As a consequence of the Defendants' systemic practice, pattern, and custom of intentionally promoting and supporting officers' and official violations of 42 U.S.C. § 1983, Plaintiff Leith was deprived of her freedom and physically and emotionally harmed.

181.    As a proximate cause of the Defendants' Nassau County, Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), custom and policy of supporting and effectively promoting the very same police abuses which occurred against Plaintiff Leith, subjecting her to great fear, personal humiliation and degradation, with wanton disregard for the serious harm and damage done to their emotional well being.

182.    In doing so, Defendants caused serious and unjustifiable harm to Ms. Leith and her infant son, K.D.

183.    Plaintiff and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A FIFTH COUNT
## 42 U.S.C. § 1983 - ABUSE OF PROCESS, FABRICATION OF EVIDENCE CLAIM

184.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 183 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

185.    The Defendants, Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), lacked reasonable suspicion to stop and detain Plaintiff Leith, and further lacked any probable cause to arrest or detain Plaintiff Leith for any period of time, and abused process when Defendant K. Sovaras gave Ms. Leith the trumped up, false, fabricated and malicious vehicle violation tickets when she was arrested based on an alleged outstanding warrant. Such abuse was continued by Defendant New York State Trooper Aziz when he knowingly, intentionally, recklessly, and/or negligently continued to wrongfully detain Ms. Leith after knowing she had no state warrant.

186.    Without such probable cause, Defendants wrongfully arrested, confined, further detained and strip searched Plaintiff.

187.    The false arrest, wrongful confinement, and other wrongful acts conducted against the Plaintiffs by the Defendants constituted an unreasonable search and seizure by police officers,

as well as abuse of process, abuse of authority, breach of police procedures, and violations of the Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. The Defendants negligently and recklessly breached their duty to prevent the commission of the civil rights violations perpetrated against Plaintiffs, including violations of 42 U.S.C. § 1983, as well as substantive and procedural due process infractions.

188.    Defendants were aware that the actions taken against the Plaintiffs were unnecessary, however, the Defendants continued to harass, intimidate, and prosecute the Plaintiff. There was an absolute lack of probable cause to arrest and retain the Plaintiff Leith in custody.

189.    As a result of said abuse of process, Plaintiff Leith suffered physical damage, eleven (11) plus hours of wrongful confinement, continued emotional damage, including prolonged stress and anxiety, fear and frustration, and Plaintiffs have been harmed financially in that she has lost days of work, and incurred and other expenses.

190.    Plaintiffs and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

**AS AND FOR A SIXTH COUNT**
**42 U.S.C. § 1983 - 4th, 5th, AND 14th AMENDMENTS**
**RACIAL PROFILING AND RACIAL DISCRIMINATION**

191.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 190 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

192.    The Defendants, NASSAU COUNTY, Defendants Sovaras (Badge #9377), Reid (Badge #6584), and New York State Trooper Aziz (Badge #171), have engaged in actions and abuses

which have deprived Plaintiff of her rights, privileges and immunities secured by the United States Constitution, including, but not limited to, rights secured by the Fourth, Fifth, Fourteenth Amendments and other laws in violation of 42 U.S.C. § 1983.

193. Plaintiff Leith, along with her infant son K.D., were stopped on Sunrise Highway-Newbridge Road, Bellmore Section not because she had committed any crime or violation, but because Plaintiff was profiled and arrested on account of being African American.

194. This was a clear violation of Plaintiff's due process rights protected by both the Fifth and Fourteenth Amendments.

195. As a direct and proximate result of said acts, Plaintiff Leith and her infant son K.D. have suffered and continue to suffer distress, humiliation, great pain and suffering.

196. Plaintiffs and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A SEVENTH COUNT
## NYS HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 296
### (Disparate Treatment)

197. Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 196 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

198. Plaintiff and the Class plead that Defendants are liable under the NYSHRL based on a disparate treatment theory of liability.

199. Defendants discriminated against Plaintiff and the Class in the traffic stops, searches, detentions, arrests and other actions by police taken toward and against Black and Brown residents

and persons in the County of Nassau who are operators of motor vehicles and/or passengers and are subject to this level and type of discriminatory and race based policing and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons based on their race, color and/or national origin.

200.     Plaintiff and the Class are members of a protected class pursuant to New York Executive Law § 296.

201.     Plaintiff and the Class had a right not be subjected to discriminatory stops, searches, seizures and arrest traffic stops, detentions, arrests and other actions by police taken toward and against them as Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers and were subject to this level and type of discriminatory and race based policing and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons. become police officers in Nassau County.

202.     Plaintiff and the Class were subjected to the adverse treatment in their ability to move about freely without being detained, searched, arrested and improperly charged due to their race and/or color and national origin.

203.     The adverse action taken against Plaintiff and the Class occurred under circumstances giving rise to an inference of discrimination.

204.     The policies and procedures adopted and applied by Defendants were implemented and enforced with an intent to discriminate against non-white persons because of their race and/or national origin and does so discriminate against them as described above.

205.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by the NYSHRL.

206.    Plaintiff and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

**AS AND FOR A EIGHTH COUNT**
**NYS HUMAN RIGHTS LAW, N.Y. EXECUTIVE LAW § 296**
**(Disparate Impact)**

207.    Plaintiffs repeat and reiterate the allegations set forth in paragraphs 1 through 205 of this *Second Amended Complaint* with the same force and effect, as if the same were fully set forth herein.

208.    Plaintiff and the Class plead, in the alternative, that Defendants are liable for discrimination under the NYSHRL based on a disparate impact theory of liability.

209.    Defendants' use of the existing practices and policies relating to traffic stops, searches, detentions, arrests and other actions by police taken toward and against Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers and are subject to this level and type of discriminatory and race based policing and who were stopped by Nassau County Police while driving, operating or being in their vehicles for improper, discriminatory, pretextual and unlawful reasons.

210.    As a direct result of Defendants' discriminatory policies and/or practices as described above, Plaintiff and the Class have suffered damages including, but not limited to, lost liberty, wrongful detention, improper and illegal searches, unlawful arrests and excessive and unreasonable use of force leading loss of freedom, damage to reputations, emotional distress and other forms of

injury.

211. The foregoing policies, pattern, and/or practices have had an unlawful disparate impact on Black and Brown residents and persons in the County of Nassau who are operators of motor vehicles and/or passengers in violation of the NYSHRL.

212. Plaintiff and the Class request relief as hereinafter described including that by reason of the foregoing, Plaintiffs have been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## DAMAGES AND RELIEF

**WHEREFORE**, the Plaintiff each request the following damages and relief:

a. On the First Count in excess of the sum of five million ($5,000,000 ) dollars;

b. On the Second Count in excess of the sum of five million ($5,000,000 ) dollars;

c. On the Third Count in excess of the sum of five million ($5,000,000 )dollars;

d. On the Fourth Count in excess of the sum of five million ($5,000,000 ) dollars;

e. On the Fifth Count in excess of the sum of five million ($5,000,000) dollars;

f. On the Sixth Count in excess of the sum of five million ($5,000,000) dollars

g. On the Seventh Count in excess of the sum of five million ($5,000,000) dollars;

h. On the Eight Count in excess of the sum of five million ($5,000,000) dollars

I. Compensatory and Punitive damages, as outlined in the aforementioned paragraphs and counts, as well as costs and attorneys fees pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law; and,

j. Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to enjoin Defendants from continuing to violate federal and state law as alleged herein; and to order such other injunctive relief as may be

appropriate to prevent any future violations of said federal and state laws;

k.     Certification of the case as a class action on behalf of the proposed Class;

l.     Designation of Plaintiff Leith as representative of the Class;

m.     Designation of Representative Plaintiff's counsel of record as Class Counsel;

n.     A declaratory judgment that the practices complained of herein are unlawful and violate the Equal Protection Clause and the NYSHRL;

o.     A declaratory judgment that Defendants' police practices in arrests and traffic stops and related treatment of  Plaintiff and Class Members was unjustified and based on race, color and/or national origin;

p.     A preliminary and permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or Class Members based on their race, color and/or national origin or participation in this lawsuit;

q.     An order that Defendants institute and carry out policies, practices, programs and training are aimed at  eradicating the effects of their past and present unlawful race, color and/or national origin discriminatory policing in traffic stops and related practices on Plaintiff and the Class members ;

r.     An order requiring Defendants to develop and institute objective and validated standards for conducting the traffic stop and related practices and  processes that do not have a disparate impact on Plaintiff and the Class members on the basis of race, color and/or national origin;

s.     An order appointing a monitor to ensure that Defendants comply with the injunction provisions of any decree ordered by the Court;

t.     An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

u.     Any and all other relief this Court deems appropriate and just.

Dated: Hempstead, New York
      April 21, 2023

                            Respectfully submitted,

                            LAW OFFICES OF
                            FREDERICK K. BREWINGTON

By:                        

                            FREDERICK K. BREWINGTON
                            *Attorneys for Plaintiffs*
                            556 Peninsula Boulevard
                            Hempstead, NY  11550
                            (516) 489-6959